NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

IN RE TERMINATION OF PARENTAL RIGHTS AS TO L.B.

No. 1 CA-JV 24-0128

FILED 05-13-2025

---

Appeal from the Superior Court in Maricopa County
No. JD41900
The Honorable Suzanne E. Cohen, Judge

**AFFIRMED**

---

COUNSEL

Maricopa County Legal Defender's Office, Phoenix
By Jamie R. Heller
*Counsel for Appellant Andrew P.*

Arizona Attorney General's Office, Phoenix
By Jennifer R. Blum
*Counsel for Appellee Department of Child Safety*

Logan Mussman Law PLLC, Phoenix
By Logan Mussman
*Counsel for the Appellee Child*

Law Office of Laurae Kerchenko PLLC, Phoenix
By Laurae Kerchencko
*Guardian Ad Litem for the Appellee Child*

_____

## MEMORANDUM DECISION

Judge Andrew M. Jacobs delivered the decision of the Court, in which Presiding Judge Cynthia J. Bailey and Vice Chief Judge Randall M. Howe joined.

_____

**J A C O B S**, Judge:

¶1 Andrew P. ("Father") appeals the juvenile court's termination of his parental relationship with his son, L.B. He argues the court abused its discretion by finding termination was appropriate under A.R.S. § 8-533(B)(8)(c) and also in L.B.'s best interests. Because reasonable evidence supports the juvenile court's ruling, we affirm.

## FACTS AND PROCEDURAL HISTORY

### A. The Juvenile Court Declares L.B. Dependent, and L.B. Is Placed in Foster Care.

¶2 L.B. was born to Father and China B. ("Mother") in January 2014. L.B. lived primarily with Mother throughout his upbringing. He sporadically lived with Father in California, for six months when L.B. was about nine months old, again for seven months when L.B. was two years old, and most recently from October 2019 to March 2022, returning afterward each time to live with Mother.

¶3 Two months later, the Department of Child Safety ("DCS") removed L.B. from Mother's care after police discovered she and L.B. had been living in her car, following a report that Mother was found passed out in her car at a gas station with L.B. DCS also received reports that Mother had been in a physical altercation with a friend in L.B.'s presence, and that, in another incident, L.B. had been left alone in a car at a warehouse for at least thirty minutes. Upon removing L.B. from Mother's care, DCS discovered paternity had not yet been established, so DCS placed L.B. in a group home. The juvenile court later declared L.B. dependent.

¶4 DCS first spoke with Father in May 2022, but he stopped responding to DCS from June to November 2022. After re-establishing contact with Father in November 2022, DCS referred him for paternity testing and asked him to complete a drug test due to concerns about

Father's criminal history involving drugs. Father completed the paternity test eight months later in July 2023. He did not complete a drug test.

**¶5** During this time, L.B. was diagnosed with autism, which required living arrangements geared toward meeting his special needs. In March 2023, DCS placed L.B. in a foster home with parents specially trained and licensed to care for children with developmental disabilities.

### B. DCS Moves to Terminate Both Parents' Relationships with L.B., and the Juvenile Court Holds an Evidentiary Hearing.

**¶6** DCS moved to terminate Mother's and Father's parental rights over L.B. in December 2023. As grounds, DCS alleged: (1) Father abandoned L.B.; (2) Mother had prolonged substance abuse; (3) Mother was mentally ill, and the condition would continue for a prolonged indeterminate period; and (4) L.B. had been in an out-of-home placement for at least fifteen months. The juvenile court considered the motion at a two-day evidentiary hearing, at which Father, Mother, and L.B.'s case specialist, Chelsea Jarman, testified.

**¶7** During his testimony, Father admitted he completed the paternity testing eight months after DCS' request. When asked why he failed to drug test at that time, Father testified he had been drug testing as required by a pending criminal case in California and had sent a copy of a drug test report to Jarman, but Jarman later testified she never received it. Father claimed he failed to keep in contact with DCS because he had been in a car accident in summer 2023 and lost his phone. He also testified he was not in contact with DCS because he had been "busy" and had "shut down." When asked whether he wrote letters or sent voice notes to L.B., he said that he sent one audio file, one video file, and photographs, but he did not send letters because he "[didn't] like writing."

**¶8** Jarman testified that L.B. was "profoundly fearful" of Father. She also testified that when L.B. received the audio file and photographs from Father, L.B. was "apprehensive about contact with [Father.]" She testified that at the time of the evidentiary hearing, L.B. was not willing to have contact with Father. When asked if he would be willing to speak with Father, L.B. "would engage in behaviors that were unsafe to himself[.]"

**¶9** Jarman further testified L.B. completed a psychological evaluation and that a unit consultant recommended clinically supervised parenting time, a service that is only offered in person. DCS considered family therapy, but Father "was not maintaining contact with [DCS] and

there would be weeks to months in between contact[,]" so family therapy never occurred.

¶10 Testimony showed Father appeared at only two of the ten to twelve child-and-family team meetings to which DCS invited him. Similarly, while Jarman gave Father the contact information for L.B.'s doctor to discuss his special needs, Father never contacted the doctor. Jarman testified she could not complete a home study because Father "ha[d] not provided an address that he is consistently residing at." She stated Father "ha[d] maintained some contact, and he ha[d] come to some court hearings, and he ha[d] definitely expressed that he cares for [L.B.], but he ha[d] not completed the tasks that would be necessary to demonstrate that he could care for [L.B.] or that he could care for [L.B.] safely." Finally, Jarman testified L.B. bonded with his foster family that satisfied his needs and that L.B. wanted to be adopted by the family.

### C. The Juvenile Court Terminates Both Parents' Relationships with L.B., and Father Appeals.

¶11 In July 2024, the juvenile court found DCS failed to prove by clear and convincing evidence that Father abandoned L.B. The court also found DCS failed to prove Mother's prolonged substance abuse justified termination. The court did not address Mother's alleged mental illness as an independent ground for termination because DCS withdrew the ground during the evidentiary hearing. However, the court terminated Mother's and Father's parental rights under A.R.S. § 8-533(B)(8)(c), finding L.B. had been in an out-of-home placement for more than fifteen months and that termination was in his best interests.

¶12 Father and Mother appealed. Mother's appellate counsel found no reviewable issues, and Mother filed no brief, so we dismissed her appeal. We have jurisdiction over Father's timely appeal. Ariz. Const. art. 6, § 9; A.R.S. §§ 8-235(A), 12-120.21(A)(1), -2101(A)(1).

### DISCUSSION

¶13 We review a juvenile court's termination of parental rights for abuse of discretion. *In re C.R.*, 256 Ariz. 170, 173 ¶ 12 (App. 2023) (citation omitted). We view the facts in the light most favorable to upholding the court's order. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549 ¶ 7 (App. 2010). The juvenile court "is in the best position to weigh the evidence, observe the parties, judge the credibility of the witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93 ¶ 18 (App. 2009) (cleaned up). We accept factual findings "if reasonable

4

evidence and inferences support them." *Brionna J. v. Dep't of Child Safety*, 255 Ariz. 471, 478 ¶ 30 (2023) (citation omitted). We do not reweigh evidence. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151 ¶ 18 (2018).

**¶14** A parent-child relationship may be terminated if a party proves by: (1) clear and convincing evidence that a ground for termination exists under A.R.S. § 8-533(B); and (2) the preponderance of the evidence that termination is in the best interests of the child. *See* A.R.S. § 8-533(B); *Kent K. v. Bobby M.*, 210 Ariz. 279, 284 ¶ 22 (2005).

**I.    The Juvenile Court Did Not Err by Finding DCS Diligently Provided Appropriate Reunification Services.**

**¶15** The juvenile court terminated Father's parental rights under A.R.S. § 8-533(B)(8)(c), which requires DCS to establish by clear and convincing evidence that: (1) L.B. had been in court-ordered out-of-home placement for at least fifteen months; (2) DCS made a diligent effort to provide appropriate reunification services; (3) Father had been unable to remedy the circumstance causing L.B. to be in court-ordered out-of-home care; and (4) there was a substantial likelihood Father would not be capable of exercising proper and effective parental care and control in the near future. *See Donald W. v. Dep't of Child Safety*, 247 Ariz. 9, 17 ¶ 25 (App. 2019); *see also Jessie D. v. Dep't of Child Safety*, 251 Ariz. 574, 581 ¶ 18 (2021) (stating that DCS is "require[d] to engage in reunification efforts 'on constitutional grounds as a necessary element of any state attempt to overcome . . . the 'fundamental liberty interest of the natural parents in the care, custody and management of their child[]'" (quoting *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192 ¶ 32 (App. 1999) (quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982)))). On appeal, Father contests only whether DCS made diligent efforts to provide appropriate reunification services, as Arizona statutory and federal constitutional law require.

**¶16** Before moving to terminate a parent-child relationship, DCS must make "a diligent effort to provide appropriate reunification services[.]" A.R.S. § 8-533(B)(8)(c). While DCS must provide services, the parent must also "make a good faith effort to reunite the family." *Maricopa Cnty. Juv. Action No. JS-4283*, 133 Ariz. 598, 601 (App. 1982) (citation omitted).

**¶17** The record shows DCS made diligent efforts to provide Father with appropriate reunification services but that he did not make the required good faith effort to engage in those services. Shortly after DCS placed L.B. in a group home in May 2022, Father spoke with DCS but then fell out of contact with DCS from June to November 2022. And when DCS

was able to contact Father and refer him to paternity testing, he waited eight months to do so. Father also failed to complete the drug test DCS requested, and though he claimed to have sent DCS a copy of a drug test report from his pending California criminal matter, DCS never received it.

¶18 Similarly, DCS asked Father to submit to a home study, but Father repeatedly provided inconsistent addresses, which kept DCS from conducting the study. When DCS gave Father L.B.'s doctor's contact information to discuss L.B.'s special needs, Father never contacted the doctor. Finally, when DCS was considering whether to start family therapy, Father "was not maintaining contact with [DCS] and there would be weeks to months in between contact[,]" so DCS could not initiate family therapy.

¶19 Father nonetheless argues DCS improperly failed to fulfill its reunification requirements, viewing them as fruitless. But DCS cannot be held at fault for Father's failure to participate in programs offered to him. *See Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353 (App. 1994) (DCS "is not required to provide every conceivable service or to ensure that a parent participates in each service it offers."). That was Father's responsibility. The juvenile court did not err by concluding DCS diligently provided the constitutionally and statutorily required services and that termination was thus proper under A.R.S. § 8-533(B)(8)(c).

## II. The Juvenile Court Did Not Err by Finding Termination Was in L.B.'s Best Interests.

¶20 In addition to finding a ground for termination proven, the juvenile court must find by a preponderance of the evidence that severance of the parent's rights is in the child's best interests. *See* A.R.S. § 8-533(B); *Kent K.*, 210 Ariz. at 284 ¶ 22. "[A] determination of the child's best interest[s] must include a finding as to how the child would benefit from a severance *or* be harmed by the continuation of the relationship." *Maricopa Cnty. Juv. Action No. JS-500274*, 167 Ariz. 1, 5 (1990). In evaluating best interests, the juvenile court must consider a child's adoptability. *Alma S.*, 245 Ariz. at 148 ¶ 1 (holding "courts must consider the totality of the circumstances . . . including the child's adoptability").

¶21 The record contains reasonable evidence that termination is in L.B.'s best interests. L.B. would benefit from severance of the parent-child relationship with Father because termination would give him permanency with a family that "understands his unique needs." Maintaining the relationship would jeopardize that permanency because Father has shown he "cannot maintain consistency with [L.B.]"

**¶22**        Moreover, L.B. expressed interest in remaining with his foster family, which is specially trained to deal with his autism.  His foster family is a potential adoptive placement, showing L.B. is adoptable.  *See Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4-5 ¶¶ 16-17 (2016) (holding adoption can support a finding termination is in the best interests of a child).  The juvenile court did not err by determining severance of the parent-child relationship was in L.B.'s best interests.

## CONCLUSION

**¶23**        We affirm.



**MATTHEW J. MARTIN • Clerk of the Court**
**FILED**:        JR